UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOSHUA SNIDER,

                    Plaintiff,                           Case No. 1:20-cv-963

v.                                                       Honorable Janet T. Neff

HANNA SAAD et al.,

                    Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.

Plaintiff filed his initial complaint on September 30, 2020.  (ECF No. 1.)  Plaintiff recently filed

another complaint, which he characterizes as an amended complaint.  (ECF No. 7.)  Under the

Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is

required to dismiss any prisoner action brought under federal law if the complaint is frivolous,

malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a

defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The

Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520

(1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly

incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

        Applying these standards, the Court will dismiss Plaintiff's complaint for failure to

state a claim against Defendants Saad, Nader, and Davis under 28 U.S.C. §§ 1915(e)(2) and

1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim,

Plaintiffs Fourteenth Amendment Equal Protection Clause claims and Fourteenth Amendment Due

Process Clause claims against the remaining Defendants.  The Court will also dismiss for failure to state a claim, Plaintiff's First Amendment retaliation claims against Defendant Peterzack. Plaintiff's Eighth Amendment claims against Defendants Traler, Maranka, Bronold, Peterzack, and Oversmith, and Plaintiff's First Amendment retaliation claims against Defendants Bronold and Oversmith remain in the case.

## Discussion

### I.    "Amended" Complaint

On October 25, 2020, Plaintiff filed a pleading that he characterized as an amended complaint.  Comparison of the amended complaint and Plaintiff's initial complaint suggests that Plaintiff did not intend to change any of his initial allegations,[1] even though there are a few differences between the initial handwritten version of Plaintiff's claims and his updated version. Instead, it appears he intended to add allegations regarding events that occurred after he filed his initial complaint.

A party may amend his or her pleading once, as a matter of course, in the preliminary stages of a case.  Fed. R. Civ. P. 15(a)(1).  That part of Plaintiff's new pleading that simply alters his initial allegations does not require leave of court.  When a proposed change to a complaint sets out "any transaction, occurrence, or event that happened after the date of the [initial] pleading[,]"  Fed. R. Civ. P. 15(d), however, the change is not an amendment; it is a supplement. *Id*.  A party may not supplement the initial pleading without the permission of the Court.  Because Plaintiff's "Amended" Complaint purports to add claims that occurred after he filed the initial complaint, he must first seek leave of court before filing it.

---

[1] The amended complaint states:  "Plaintiff hereby request the same relief against all Defendants as stated in the original complaint . . . ."  (Am. Compl., ECF No. 7, PageID.69.)

Rule 15(d) affords courts the same level of discretion to permit supplements that Rule 15(a) affords to permit amendments.  6A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1504 (3d. ed. Westlaw Aug. 2019 Update).  Rule 15(a) provides that a party may amend its pleadings by leave of court and that "leave [to amend] shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court identified some circumstances in which "justice" might counsel against granting leave:  "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Id* at 182.  If a claim would be properly dismissed, amendment to add the claim would be futile.  *Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 383 (6th Cir. 1993).

Plaintiff's proposed supplement does not appear to be futile or the product of bad faith or a dilatory motive.  It does not appear that permitting the supplementation will unduly prejudice the Defendants.  Therefore, the Court will allow the supplementation.

## II.   Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan.  The events about which he complains occurred at that facility.  Plaintiff sues Dr. Hanna Saad, ICF Assistant Deputy Warden C. Traler, ICF Resident Unit Manager Unknown Oversmith, ICF Warden John Davis, ICF Assistant Resident Unit Supervisor Unknown Peterzack, ICF OPT[2] Mental Health Unit Chief Unknown Maranka, and ICF OPT Mental Health Unit members Kira Nader and L. Bronold.

---

[2] The MDOC describes OPT as follows:

The Outpatient Services (OPT) program is an integral component of the mental health continuum of care, as it provides psychiatric services to prisoners residing in general population who have a

Plaintiff alleges that he suffers from a major mental disorder.  He claims that he was transferred to the Level 5 START program at ICF on August 13, 2019, for the purpose of treating his major mental disorder.  According to MDOC Director's Office Memorandum 2020-20:

> The Department is in the process of piloting general population Start Units as an alternative placement for eligible prisoners who would otherwise be classified to Administrative Segregation.  These units provide a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting.  The pilot Start Units for security level V prisoners will be located at the Ionia Correctional Facility (ICF) and Marquette Branch Prison (MBP); the pilot Start Unit for security level IV prisoners will be at the Oaks Correctional Facility (ECF).  The program may be expanded to other facilities as approved by the Deputy Director of Correctional Facilities Administration (CFA).
>
> The targeted prisoner population groups for placement in a Start Unit are:
>
> • Prisoners who have been diagnosed with serious mental illness, as defined by Mental Health Services policy, procedure and protocol, whose disruptive behavior would warrant reclassification to administrative segregation.
>
> • Prisoners who refuse to return to a traditional general population setting that has resulted in extended administrative segregation placement.
>
> • Prisoners who have a history of repeated disruptive behavior, who would otherwise be classified to administrative segregation for new negative behavior.

---

serious mental illness/disability, as well as ensuring continuity, quality, and accessibility of services for prisoners discharged from more intensive levels of care.

Outpatient therapy is designed to help prisoners deal with chronic mental illness by compensating for any deficiencies attributed to their diagnoses, and by developing and implementing relapse prevention plans. Outpatient services are provided by interdisciplinary treatment teams that typically consist of a Unit Chief, Psychiatrist, at least two Qualified Mental Health Professionals (psychologist, clinical social worker, registered nurse or clinical nurse specialist) and a unit secretary. Members of the treatment team work with prisoners to design and implement an individualized plan of services, which may consist of any combination of group therapy, individual therapy or psychiatric intervention

https://www.michigan.gov/corrections/0,4551,7-119-68854_68856_9744-23253--,00.html (visited Oct. 25, 2020).

- Other prisoners who would benefit from placement in the Start Unit based on their disruptive behavior, as approved by the CFA Deputy Director or designee.  This may include prisoners who are within one year of their discharge date or who have received positive parole action.

MDOC DOM 2020-20 (eff. Jan. 1, 2020) available at https://www.michigan.gov/documents/

corrections/DOM_2020-20_Start_Unit_Final_675313_7.pdf (visited Oct. 25, 2020).

On October 19, 2019, Plaintiff reports that he was released to the general population.  On February 18, 2020, Plaintiff returned to segregation after receiving a Class I misconduct ticket.  On February 20 and 28, 2020, Plaintiff wrote to Defendant Maranka regarding placement in the ICF START Program because 24-hour lockdown made Plaintiff's mental health worse.  During March of 2020, Plaintiff was placed back into the ICF START Program; but, apparently, he was not permitted to participate in the START Program group therapy.

Plaintiff claims that on March 16, 2020, Defendant Nader told Plaintiff that he could not be placed back in the START Program because Plaintiff had received a Class I misconduct ticket.  Plaintiff states that Defendant Nader's statement was incorrect under the START Program rules.  As a result of Defendant Nader's action, Plaintiff had a bad anxiety attack with chest pain, depression, and thoughts of self-harm.

Two days later, Plaintiff was reviewed by the Security Classification Committee, consisting of Defendants Traler, Maranka, and Bronold.  Plaintiff told the committee members that segregation made his mental illness worse.  During March, Plaintiff also informed Defendant Dr. Saad and Defendant Oversmith that the conditions of segregation made Plaintiff's mental health symptoms—such as anxiety, depression, emotional distress, and thoughts of self-harm—worse.

On April 13, 2020, Plaintiff was seen by the Michigan Parole Board.  They gave Plaintiff an "AD-47 parole/mental health parole."  (Compl., ECF No. 1, PageID.10.)  On May 30, 2020, Plaintiff wrote a letter to Defendant Traler informing him that the isolation and 24-hour

lockdown was making Plaintiff's mental illness worse.  Plaintiff does not indicate why he was isolated or in 24-hour lockdown at the time.

On June 17, 2020, Plaintiff informed Defendant Traler that he had a parole but that the 24-hour lockdown made Plaintiff's mental illness worse.  Plaintiff requested a transfer to a facility with a proper mental health program.  Defendant Traler refused.  The refusal caused Plaintiff depression and bad anxiety with chest pain.

On June 22, 2020, Plaintiff moved to 3 unit, the other ICF START Program housing unit.  During July, Plaintiff got a new OPT Mental Health worker, Defendant Bronold.  Plaintiff informed Defendant Bronold that the 24-hour lockdown made his mental illness worse and that it was not good for a mentally ill prisoner to leave on parole directly from a 24-hour lockdown status. Defendant Bronold refused to transfer Plaintiff.  On July 10, Plaintiff suffered a bad anxiety attack with chest pain.

On July 16, 2020, Plaintiff saw Defendant Dr. Saad.  Plaintiff complained that his psych meds were crushed and given to him in water.  Plaintiff claims that Dr. Saad ordered the meds to be provided this way because Plaintiff complained to OPT Mental Health members. Plaintiff claims that Dr. Saad ordered the meds to be provided that way to intentionally inflict emotional distress and to cause Plaintiff depression, anxiety, sadness, high blood pressure, bad chest pain, and thoughts of self-harm.  The documents Plaintiff attaches to his complaint suggest that Dr. Saad ordered meds to be provided this way to ensure that Plaintiff took them.

On July 19, 2020, Plaintiff was granted an AD-47 mental health parole.  Plaintiff was given a discharge date of August 20, 2020.  On July 28, 2020, Plaintiff was seen by the Security Classification Committee consisting of Defendants Traler, Maranka, and Bronold. Plaintiff repeated his complaints about the conditions of his confinement and the impact of those

conditions on his mental health.  The committee members refused to transfer Plaintiff or to place him in the ICF START Program group therapy groups.  Later that day, Plaintiff had a panic attack. That month Plaintiff also had thoughts of self-harm, depression, weight loss, sadness, and emotional distress.

On August 12, 2020, Defendant Bronold told Plaintiff she would email Mrs. Linda Goldbird, the case manager over Plaintiff's mental health parole.  On August 17, 2020, Defendant Peterzack told Plaintiff his parole had been suspended, although Peterzack could not say why. Plaintiff suffered a panic attack with chest pain, increased blood pressure, depression, sadness, emotional distress, and thoughts of self-harm.  Later that day, Defendant Bronold told Plaintiff the parole was suspended so that Plaintiff could be sent instead to a residential sex offender treatment program in the community.  She laughed and walked away.

The next day Plaintiff found out through the parole board that his parole was suspended because of the email from Defendant Bronold.  Plaintiff claims that Bronold informed the parole board, falsely, that Plaintiff had to take a sex offender class.  Plaintiff notes that he is not a sex offender and does not have any criminal sexual conduct convictions or charges.  Plaintiff claims Bronold sent the email labeling Plaintiff as a sexual predator because of the complaints Plaintiff made against her and the other OPT Mental Health members.  Plaintiff became so depressed he tried to hang himself with a line made from his sheet.  An officer discovered Plaintiff and talked him out of it.

On August 19, 2020, Plaintiff asked Defendant Peterzack for a transfer to a proper mental health program because ICF's Level V 24-hour lockdown made Plaintiff's mental illness symptoms worse.  Peterzack used Plaintiff's "scoor guild line's points" to determine that Plaintiff

could not transfer out.[3]  (Compl., ECF No. 1, PageID.20.)  Plaintiff informed Peterzack that he could not use that score to override Plaintiff's need for mental health treatment.  Peterzack responded by telling Plaintiff to stop making complaints because "you see what happen[ed] to your parole."  (*Id.*)  Peterzack then laughed and walked away.

On August 21, 2020, Plaintiff had a similar conversation with Defendant Oversmith.  He complained about the impact of the restrictive housing conditions on the symptoms of his mental illness.  Oversmith told Plaintiff, "This is what you get for making complaint[]s."  (*Id.*, PageID.21.)  She told Plaintiff to stop sending kites and to stop having his family contact the warden.  Otherwise, Oversmith said, she would make sure that Plaintiff maxed out of prison from segregation.  Oversmith then laughed and walked away.

On August 28, 2020, Plaintiff wrote a kite to Warden Davis regarding the impact of the restrictive housing conditions on the symptoms of Plaintiff's mental illness.

Plaintiff contends that the conduct of Defendants was retaliatory in violation of this First Amendment rights, constituted cruel and unusual punishment in violation of his Eighth Amendment rights, and violated his right to equal protection of the laws under the Fourteenth Amendment.

Plaintiff seeks a judgment declaring that Defendants have violated his constitutional rights, as well as $1,000,000.00 in compensatory and punitive damages.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp.*

---

[3] It is not apparent what Plaintiff means by "scoor guild line's points."  Presumably, it applies to the scoring variables included on the security classification screening form completed in accordance with MDOC Policy Directive 05.01.130.

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## IV.    Eighth Amendment

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff's allegations implicate two distinct Eighth Amendment claims: a claim based on the conditions in segregation; and a claim based on certain Defendants refusal to permit Plaintiff to participate in START Program group therapy.  Each claim is discussed below.

### A. Conditions of confinement in segregation

In the MDOC, security classifications, from least to most secure, are as follows: Levels I, II, IV, V, and administrative segregation.  MDOC Policy Directive 05.01.130 ¶ B (Oct. 10, 2011).  There are three types of segregation: temporary segregation, administrative segregation, and punitive segregation.  MDOC Policy Directive 04.05.120 ¶¶ M, Q, Z (June 1, 2019).  Administrative segregation is the most restrictive and is imposed for institutional security, *e.g.*, when a prisoner poses a serious escape risk. *Id.* ¶ Q.  Detention, or "punitive segregation," can be imposed as a sanction for committing a major misconduct, if ordered by the hearing officer.

10

*Id.* ¶ Z. If possible, detention is served in a designated detention cell rather than in a cell designated for administrative segregation. *Id.* A prisoner may not remain in detention for a period longer than that ordered by the hearing officer, *id.* ¶ Z, but a prisoner classified to administrative segregation remains in that classification until he is reclassified, *id.* ¶ I. The "behavioral adjustment" of a prisoner in segregation is reviewed periodically by the Security Classification Committee (SCC). *Id.* ¶ FFF. Reclassification from administrative segregation occurs only with the approval of the SCC and the Warden (or designee). *Id.* ¶ KKK.

Prisoners in segregation endure property and activity restrictions in addition to those that apply to general population prisoners. Of significance to Plaintiff's allegations is a restriction on "out-of-cell" exercise:

> [A] prisoner in segregation shall be provided with . . . a minimum of one hour per day, five days per week of out-of-cell exercise, except that, for reasons of safety or security, a prisoner serving a sanction of detention or loss of privileges that includes the loss of yard may be provided such exercise only after s/he has served a period of time determined by the Warden or Deputy Warden. However, the prisoner shall not be deprived of out-of-cell exercise for more than 30 consecutive days without being provided a seven-day break during which the prisoner shall be given the opportunity for our-of-cell exercise at least one hour per day, five days per week.

*Id*. ¶AA, 21. Plaintiff claims, however, that he has been subject to 24-hour lockdown for a period of several months. Accepting the allegation as true, and assigning a plain meaning to the words "24-hour lockdown," the Court interprets Plaintiff's allegations as claiming he is not being permitted out of his cell for exercise or other programming.

The Eighth Amendment prohibits any punishment which violates the civilized standards of humanity and decency, or involves the unnecessary and wanton infliction of pain. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). To prove an Eighth Amendment violation, an inmate must show that he has been deprived of the minimum civilized measures of life's necessities. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Because placement in segregation

11

is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is typically insufficient to support an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008); *see also Lacey v. Michigan Dep't of Corr.*, No. 95-1097, 1995 WL 564301 (6th Cir. Sept. 21, 1995) (placement in detention did not violate Eighth Amendment); *Eaddy v. Foltz*, No. 85-1419, 1985 WL 14065 (6th Cir. Dec. 18, 1985) (whether an Eighth Amendment claim is stated for placement in segregation depends upon severity or pervasiveness of conditions).

Nonetheless, the Supreme Court has recently focused attention toward the consequences of long-term isolation in segregation:

> The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators.  Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes."  The State of the Prisons in England and Wales 152 (1777).  In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings.  A Tale of Two Cities (1859).  And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.
>
> One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy."  *In re Medley,* 134 U.S. 160, 170, 10 S. Ct. 384, 33 L. Ed. 835 (1890); see also *id.,* at 168, 10 S. Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition . . . and others became violently insane; others, still, committed suicide").

*Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring); *see also Glossip v. Gross,* 576 U.S. 863, 925-26 (2015) (Breyer, J., dissenting) (noting the "dehumanizing conditions of confinement" and that "prolonged solitary confinement produces numerous deleterious harms").

Indeed, several studies have shown that long-term isolation has deleterious psychological effects.  "There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)).  "[E]ven a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." *Id.* at 567 (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006)).  Solitary confinement frequently causes "[a]nxiety . . . [d]epression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation." *Id.* at 566 (citing Haney & Lynch, at 500-01, 521-31).

Further, the Sixth Circuit recently recognized that segregation more severely affects inmates with existing mental illness.  *See J.H. v. Williamson Cty. et al.*, No. 18-5874, 2020 WL 939197 (6th Cir. Feb. 27, 2020).  "[S]olitary confinement 'can cause severe and traumatic psychological damage'" and an inmate's existing mental illness should be considered before placing him in or extending his isolation.  *Id.* at *6 (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017)); *see also Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018) (holding that the continued isolation of an inmate raised a "genuine concern that the negative psychological effects of his segregation will drive him to self-harm" because he had a mental illness and had

13

already been isolated for 11 years).  While considering the mental health of the inmate, a court should remain "mindful of the nature and duration" of the confinement in segregation.  *J.H.*, 2020 WL 939197, at *6.

Petitioner has alleged that his detention is more severe than the typical conditions of segregation.  He has also alleged that those conditions have a peculiarly deleterious impact on him.  Therefore, Plaintiff's allegations regarding segregation may suffice to state an Eighth Amendment claim and the claim is not properly dismissed on preliminary review.

Plaintiff's allegations regarding the conditions in segregation do not allege the same active involvement on the part of each Defendant.  Defendants Traler, Maranka, and Bronold served as the Security Classification Committee for Plaintiff and, thus, were actively involved in keeping Plaintiff in segregation despite his complaints regarding the impact on his symptoms.  Similarly, Defendants Traler and Peterzack each specifically denied Plaintiff's request for a transfer and Defendant Oversmith told Plaintiff she would make sure Plaintiff served his maximum sentence in segregation.  There are no allegations, however, that Defendants Davis, Saad, or Nader played an active role in keeping Plaintiff in segregation.

With regard to Warden Davis, Plaintiff alleges that he wrote Davis on August 28, 2020, regarding the deleterious impact of 24-hour lockdown in segregation on Plaintiff's mental illness symptoms.  Essentially, Plaintiff complains that Warden Davis did not appropriately respond to Plaintiff's complaint or that Warden Davis failed to correct the constitutional wrongs perpetrated by his subordinates.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556

F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).  Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendant Davis engaged in any active unconstitutional behavior. Accordingly, he fails to state an Eighth Amendment claim against Davis.

Similarly, Plaintiff fails to state an Eighth Amendment claim against Defendant Nader relating to Plaintiff's conditions of confinement in segregation.  Plaintiff alleges that Nader refused to permit Plaintiff to participate in START Program therapy groups; but Plaintiff's allegations do not permit the inference that Nader kept Plaintiff in segregation.

Finally, Plaintiff alleges that he told Dr. Saad about the impact the segregation conditions had on Plaintiff's mental illness symptoms, but there are no allegations that Dr. Saad played an active role keeping Plaintiff in segregation.

Accordingly, the Court concludes that Plaintiff has sufficiently stated an Eighth Amendment claim based on the segregation conditions of confinement against Defendants Traler, Maranka, Bronold, Peterzack, and Oversmith.  Plaintiff has failed to state such a claim against Defendants Davis, Saad, and Nader.

**B.  Deliberate indifference to serious medical needs based on refusal to permit Plaintiff to participate in START Program group therapy[4]**

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment also requires prison officials to provide medically necessary mental health treatment to inmates. *See Estelle*, 429 U.S. at 103; *Government of the Virgin Islands v. Martinez*, 239 F.3d 293, 301 (3d Cir. 2001); *Lay v. Norris*, No. 88-5757, 1989 WL 62498, at *4 (6th Cir. June 13, 1989); *Potter v. Davis*, No. 82-5783, 1985 WL 13129, at * 2 (6th Cir. April 26, 1985).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  The Court concludes that Plaintiff has adequately alleged the serious nature of his medical need.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or

---

[4] The detrimental impact of 24-hour lockdown in segregation on the symptoms of Plaintiff's mental illness might also be construed as deliberate indifference to a serious medical need on the part of those Defendants who kept Plaintiff in segregation.  To the extent it was Plaintiff's intention to raise the Eighth Amendment claim, he has sufficiently stated that claim as well.  That claim appears to be completely coextensive with the "conditions of confinement" claim considered above and will not be analyzed separately.

with knowledge that harm will result." *Farmer,* 511 U.S. at 835.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . :  A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt,* 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer,* 511 U.S. at 842)).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105.  As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment,

federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

"Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs because they did not permit him to participate in the ICF START Program therapy groups. Based on the documents Plaintiff attaches to his complaint, however, it is apparent that Plaintiff received treatment for his mental illness throughout the period of time he was at ICF. It is not apparent from Plaintiff's allegations how the START Program therapy groups were medically necessary. The circumstances described by Plaintiff with regard to the ICF START Program therapy groups is a dispute over the adequacy of treatment. Such a medical malpractice claim does not rise to the level of a constitutional violation.

Plaintiff also suggests that Dr. Saad's decision to give Plaintiff one or more of his medications crushed into water might be deliberate indifference to Plaintiff's serious medical need.

18

Plaintiff has failed to allege that Dr. Saad's decision to so medicate Plaintiff reflects a conscious disregard of a known risk to Plaintiff.  To the contrary, based on the documents Plaintiff attaches to his initial complaint, it appears that Dr. Saad chose to suspend Plaintiff's crushed medications in water to ensure that Plaintiff took them.  Plaintiff's paranoia had apparently prompted Plaintiff to avoid taking his medications in the past.  Accordingly, Plaintiff has failed to state an Eighth Amendment deliberate indifference claim against Dr. Saad based upon the decision to provide Plaintiff medications crushed into water.

## V.    Fourteenth Amendment—Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Therefore, the threshold element of an equal protection claim is disparate treatment.  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'").

The Sixth Circuit has recognized that different types of equal protection claims require differing levels of scrutiny:

> In typical equal protection cases, plaintiffs "generally allege that they have been arbitrarily classified as members of an 'identifiable group.'  "*Engquist* [*v. Oregon Dep's of Agric.*, 553 U.S. 591, 601 (2008)] (quoting *Personal Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  When the identifiable group has been recognized as a suspect or quasi-suspect class, courts examine the classification under a heightened level of scrutiny.  *See, e.g., Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 290-91 (1978) (opinion of Powell, J.) (treating race as a suspect

classification); *Craig v. Boren*, 429 U.S. 190, 197 (1976) (treating gender as a quasi-suspect classification). When the identifiable group has not been recognized as a suspect or quasi-suspect class, courts examine the classification under rational basis review.  *See, e.g., Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (discrimination based on age).

In contrast, in "class-of-one" claims, "the plaintiff [does] not allege membership in a class or group" but rather simply "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.  "[T]he hallmark of [a 'class-of-one'] claim is not the allegation that one individual was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." *Aldridge v. City of Memphis*, 404 F. App'x 29, 42 (6th Cir. 2010); *see also Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir.2008) ("The 'class of one' theory . . . is unusual because the plaintiff in a 'class of one' case does not allege that the defendants discriminate against a group with whom she shares characteristics, but rather that the defendants simply harbor animus against her in particular and therefore treated her arbitrarily.").

*Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012).  Plaintiff does not allege he is being discriminated against because he is a member of a suspect or quasi-suspect class; he alleges he has been singled out—a "class-of-one" claim.  Plaintiff claims he has been singled out in two respects:  he was denied participation in the START Program therapy groups and he was required to participate in a residential sex offender treatment program.

### A.  Denial of participation in START Program therapy groups

Plaintiff alleges that Defendants treated him disparately when they denied him participation in the START Program therapy groups.  Thus, Plaintiff alleges disparate treatment here.  But his allegations are conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

An "equal protection" plaintiff must be similarly situated to his comparators "in all relevant respects . . . ."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011); *see also Paterek v. Vill. of Armada*, 801 F.3d 630, 650

(6th Cir. 2015) ("'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'"); *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff brining an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").   Plaintiff claims that other prisoners in the START Program are permitted to participate in therapy groups; but, he does not identify a single such prisoner.  *Bertovich v. Vill. of Valley View*, 431 F. App'x 455, 458 (6th Cir. 2011) (court affirmed dismissal of "class of one" equal protection claims where Plaintiff "[did] not point to any individual who was treated differently . . . ."); *see also Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) ("Although the plaintiffs claim that they have been treated differently from other individuals seeking rezoning, they fail to allege any specific examples of *similarly situated* individuals . . . ."); *Sanders v. City of Hodgenville*, 323 F. Supp. 3d 904, 911 (W.D. Ky. 2018) ("Sander's class-of-one claim fails as a matter of law . . . Sanders fails to identify any similarly situated individual who was treated differently.").

Plaintiff also fails to allege that those who were treated differently were similarly situated in all relevant respects.  *Umani v. Mich. Dep't of Corr.,* 432 F. App'x 453, 460 (6th Cir. 2011) (To be a similarly-situated person, "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it.'") (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *Project Reflect, Inc. v. Metropolitan Nashville Bd. of Public Educ.*, 947 F. Supp. 2d 868, 881 (M.D. Tenn. 2013) (""Plaintiffs . . . fail to plead the existence of a similarly situated comparator . . . [therefore,] the Complaint does not contain sufficient factual matter to state a plausible claim.").

Plaintiff wholly fails to allege facts showing that he was similarly situated in all relevant respects to any other person who was treated differently.  Therefore, Plaintiff has failed to state a claim for violation of his equal protection rights by virtue of Defendants denying him participation in START Program therapy groups.

### B.  Requirement that Plaintiff participate in RSOP

Plaintiff also complains that Defendants violated his equal protection rights by requiring that he participate in a sex offender treatment program.  Plaintiff suggests he is being treated differently than others; however, once again, Plaintiff has failed to identify any similarly situated comparators.  Accordingly, Plaintiff has failed to state an equal protection claim based on the requirement that he participate in sex offender treatment.

## VI.    First Amendment retaliation

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id*.  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### A.  Protected conduct

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).  But the right to file

grievances is protected only insofar as the grievances are not "frivolous." *Herron*, 203 F.3d at 415.  "Abusive or manipulative use of a grievance system would not be protected conduct," *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012), and an "inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory," *Spies v. Voinovich*, 48 F. App'x 520, 525 (6th Cir. 2002).

Moreover, an inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 299 (3d Cir. 2016) ("[The prisoner's] oral grievance to [the prison officer] regarding the anti-Muslim harassment he endured at work constitutes protected activity under the First Amendment."); *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) ("[W]e decline to hold that legitimate complaints lose their protected status simply because they are spoken."); *see also Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009) (finding that a prisoner engaged in protected conduct by *threatening* to file a grievance). "Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) (finding that a conversation constituted protected petitioning activity) (quoting *Pearson*, 471 F.3d at 741).

Plaintiff contends that Defendants retaliated against him because of his many complaints about the conditions of his confinement.  For purposes of this preliminary review, Plaintiff has sufficiently alleged protected conduct.

### B.  Adverse action

Plaintiff alleges that certain Defendants took adverse action against him, purportedly because of his protected conduct.  The adverseness inquiry is an objective one and

does not depend on how a particular plaintiff reacted.  The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence.  *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

Plaintiff claims that Dr. Saad directed that Plaintiff's psych meds be provided to Plaintiff crushed and in water "because of the complaints Plaintiff made to O.P.T. Mental Health Members."  (Compl., ECF No. 1, PageID.13.)  Requiring that medications be provided crushed and suspended in water is not the sort of adverse action that would deter a person of ordinary firmness from participating in protected conduct.  Accordingly, the Court concludes that Plaintiff fails to state a retaliation claims against Dr. Saad.

Plaintiff claims that Defendant Bronold took the adverse actions of providing false information to the parole board that led to the suspension of Plaintiff's parole, requiring Plaintiff to participate in a residential sex offender treatment program, and threatening to keep Plaintiff in segregation until he served his maximum sentence.  The Court concludes that Bronold's actions, or threatened actions, could deter a person of ordinary firmness from participating in protected conduct.

Plaintiff claims that Defendant Peterzack informed Plaintiff that his parole had been suspended and would not transfer Plaintiff.  Plaintiff does not allege any facts which support the inference that Peterzack had a role in suspending Plaintiff's parole, only that Peterzack informed him of the decision.  Moreover, although Plaintiff desired a transfer, he does not allege any facts that suggest he was entitled to a transfer.  Therefore, it does not appear that Peterzack's "denial" of a transfer would be the sort of punitive action that might deter protected conduct.  Accordingly, the Court concludes that Plaintiff has failed to allege a retaliation claim against Defendant Peterzack.

24

Plaintiff claims that Defendant Oversmith threatened to make sure that Plaintiff served his maximum sentence in segregation if Plaintiff—or Plaintiff's family at Plaintiff's request—continued to make complaints.   Being subjected to the restrictive conditions of segregation indefinitely could certainly deter an ordinary person from participating in protected conduct.   Therefore, the Court concludes that Plaintiff has sufficiently alleged that Defendant Oversmith took "adverse action" against Plaintiff.

Finally, Plaintiff suggests that his placement on modified access might be retaliatory.   The Sixth Circuit repeatedly has held that placement on modified access does not constitute an adverse action for purposes of a retaliation claim.  *See, e.g., Alexander v. Vittitow*, No. 17-1075, 2017 WL 7050641, at *5 (6th Cir. Nov. 9, 2017); *Jackson v. Madery*, 158 F. App'x 656, 660 (6th Cir. 2005) (per curiam); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 446 (6th Cir. 2005); *Kennedy v. Tallio*, 20 F. App'x 469, 471 (6th Cir. Sept. 26, 2001).  Placement on modified access would not deter a person of ordinary firmness from continuing to engage in protected conduct, because modified-access status does not impair the ability to file civil rights actions in federal court.  A plaintiff's placement on modified access to the grievance procedure merely enables prison officials to screen grievances prior to filing to determine whether they were grievable, non-frivolous, and non-duplicative.  *See Kennedy*, 20 F. App'x at 471 (citing Mich. Dep't of Corr. Policy Directive 03.02.130(II)(PP)).   For the same reasons that placement on modified grievance access does not amount to adverse action, an official's rejection of a grievance is not sufficiently adverse to state a retaliation claim.  *See, e.g.*, *Branch v. Houtz*, No. 1:16-cv-77, 2016 WL 737779, at *6 (W.D. Mich. Feb. 26, 2016).

### C.  Retaliatory motive

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005);

*Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987).  "[A]lleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"  *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening).

Plaintiff has alleged that Defendants Bronold and Oversmith both stated their retaliatory motives to him.  Accordingly, Plaintiff has sufficiently alleged all three elements of a First Amendment retaliation claim against Defendants Bronold and Oversmith.

## VII.    Fourteenth Amendment—Due Process Clause

Plaintiff does not specifically reference the Due Process Clause of the Fourteenth Amendment in his complaint or supplement; however, he repeatedly complains that the grievance coordinator has refused to provide grievance forms or refused to process Plaintiff's complaints.

Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan

26

law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, a refusal to process an administrative grievance would not deprive Plaintiff of due process.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Saad, Nader, and Davis will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, the following claims against the remaining Defendants: Fourteenth Amendment Equal Protection Clause claims and Fourteenth Amendment Due Process Clause claims.  The Court will also dismiss for failure to state a claim, Plaintiff's First Amendment retaliation claims against Defendant Peterzack. Plaintiff's Eighth Amendment claims against Defendants Traler, Maranka, Bronold, Peterzack, and Oversmith and Plaintiff's First Amendment retaliation claims against Defendants Bronold and Oversmith  remain in the case.

An order consistent with this opinion will be entered.


Dated:   November 17, 2020                          /s/ Janet T. Neff
                                                    Janet T. Neff
                                                    United States District Judge

27